Filed 8/17/21  Alexis M. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ALEXIS M., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF STANISLAUS COUNTY, <br><br> Respondent; <br><br> STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, <br><br> Real Party in Interest. | F082750 <br><br> (Super. Ct. Nos. JVDP-19-000193, JVDP-19-000194 & JVDP-19-000195) <br><br> **AMENDED ORDER MODIFYING OPINION** <br> [NO CHANGE IN JUDGMENT] |

**THE COURT:**

It is ordered that the nonpublished opinion filed herein on August 16, 2021, be modified as follows:

1.      The caption should list the superior court case Nos. as JVDP-19-000193, JVDP-19-000194, and JVDP-19-000195.

There is no change in the judgment.

DE SANTOS, J.

WE CONCUR:


SMITH, Acting P.J.


MEEHAN, J.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| ALEXIS M., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF STANISLAUS COUNTY, <br><br> Respondent; <br><br> STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, <br><br> Real Party in Interest. | F082750 <br><br> (Super. Ct. Nos. JVDP-19-000193, JVDP-19-000194 & JVDP-19-000195) <br><br> **ORDER MODIFYING OPINION** <br> [NO CHANGE IN JUDGMENT] |

**THE COURT:**

It is ordered that the nonpublished opinion filed herein on August 16, 2021, be modified as follows:

2.      The caption should list the superior court case Nos. as JVDP-19-000193, JVDP-19-000194, and JVDP-19-000194.

There is no change in the judgment.

DE SANTOS, J.

WE CONCUR:

SMITH, Acting P.J.

MEEHAN, J.

Filed 8/16/21  Alexis M. v. Superior Court CA5 (unmodified opinion)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| ALEXIS M.,<br><br>　　　Petitioner,<br><br>　　　v.<br><br>THE SUPERIOR COURT OF STANISLAUS COUNTY,<br><br>　　　Respondent;<br><br>STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>　　　Real Party in Interest. | F082750<br><br>(Super. Ct. Nos. JVDP-000193, JVDP-000194 & JVDP-000195)<br><br><br>**OPINION** |

### THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Ann Q. Ameral, Judge.

Jill Smith, under appointment by the Court of Appeal, for Petitioner.

No appearance for Respondent.

Thomas E. Boze, County Counsel, and Lindy Giocapuzzirotz, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]　　　Before Smith, Acting P.J., Meehan, J. and De Santos, J.

Alexis M. (mother) seeks extraordinary writ relief from the juvenile court's order setting a Welfare and Institutions Code section 366.26[1] hearing for August 26, 2021, after it granted a section 388 petition filed by real party in interest Stanislaus County Community Services Agency (Agency) and terminated her reunification services as to her now eight-year-old son, L.P., six-year-old daughter, Li.P., and four-year-old daughter, M.P (collectively, the children). Mother contends the juvenile court abused its discretion in granting the petition because there is insufficient evidence of detriment to return the children to her and, in any event, the juvenile court should have continued her reunification services. Mother asks us to remand for either continued services or the return of the children to her custody. We deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

The family came to the Agency's attention in April 2019, when it received a referral that then four-year-old Li.P. told a mandated reporter the children's father, John P. (father), sexually abused her. When the Agency responded, mother made various statements regarding father's presence in California—she first said he was only visiting from Missouri but later stated he moved from Missouri four months before to be with the family. Mother denied she was aware Li.P. was being sexually abused, although she did say Li.P. exhibited sexualized behaviors. Mother also disclosed drinking six 12-ounce beers two or three times per week and smoking marijuana in the backyard while the children were inside with their maternal aunt.

When interviewed by the social worker, Li.P. disclosed father touched her private parts "a lot of times," "my dad made me suck his private part," and "[m]y dad has a huge big pee pee and my dad peed in my mouth." Mother was emotional and appeared shocked when the social worker told her of Li.P.'s disclosure. Father denied being aware of anyone sexually abusing Li.P. or that she disclosed being sexually abused. The

---

**1**     Undesignated statutory references are to the Welfare and Institutions Code.

2.

parents agreed to a safety plan which required father to remain out of the home and not to have any contact with the children until the end of the investigation.

In May 2019, the family entered into a voluntary family maintenance agreement (family agreement) to engage in services, in which they stipulated father would remain out of the family home and would not be left with the children unsupervised. Father and Li.P. were referred to Parents United for services related to the sexual abuse allegations. At the July 2019 intake assessment, mother disclosed a previous incident in which Li.P. was touched inappropriately by her stepuncle. When Li.P. heard mother use the phrase "private parts," she began talking about father asking her to "suck it" when he was in the shower. Father denied the sexual abuse. Li.P. was referred to weekly group therapy.

Despite constant reminders of the family agreement, father was found at mother's home on three separate occasions and mother knowingly allowed him around the children. The case was referred for a further emergency response assessment. The two older children disclosed mother, father, and their grandparents all lived in the home. Mother and father denied father was living there or staying the night. Mother told the social worker she questioned father and Li.P. in order to see it "50/50" and she did not "see that he's lying to me." She believed a five-year-old boy abused Li.P. and stated: "I know molesters. I was molested, and in his eyes, I don't see that he did it." Some of father's belongings were found in the children's room.

The children were examined. While L.P. did not have any marks or bruises, two-year-old M.P. had marks and bruises on her shins, red marks near her left ankle, a bruise on her right elbow, a red mark on her right lower back, redness on her torso near her left underarm, and redness with a mark on her bottom. Li.P. had bruises and marks on her feet, shins, torso, bottom, forearms, and shoulder.

The children were placed in protective custody and the Agency filed a petition alleging the children came within the provisions of section 300, subdivisions (b)(1) (failure to protect), (d) (sexual abuse), and (j) (abuse of sibling), based on the sexual

abuse of Li.P. by father, mother's denial and failure to protect after disclosure, possible substance abuse by both parents, mother and father knowingly violating the family maintenance agreement, and the marks and bruises found on the children. The girls were placed together in a foster home, while L.P. was placed in a separate foster home. The juvenile court detained the children on August 20, 2019.

### The Jurisdiction/Disposition Hearing

The Agency's report for the jurisdiction/disposition hearing recommended mother receive reunification services but father be denied services under section 361.5, subdivision (b)(6). The parents had child welfare histories in Kansas and Missouri for neglect and lack of supervision or physical abuse. In the Kansas case, the two older children were removed in December 2016 due to lack of supervision, returned to mother's care in April 2017, and the case was closed in October 2017.

In her social history, mother reported being molested as a child by three men who were her stepfather's friends, but she said it was "not that serious" and she did not receive counseling. As a child, she was removed from her home by child protective services a few times and reunified with her mother each time. She dropped out of high school during her sophomore year and did not return after she became pregnant with L.P. Mother worked as an in-home supportive services (IHSS) care provider.

Mother said she ended her relationship with father a month before he came to California and they were not an intact couple. They tried to resume their relationship when he arrived in California, but she did not feel connected to him and they never made the relationship official. Ideally, she wanted to coparent with father and while they do not live together, they saw each other outside of visitation, as it made sense to ride together to meetings and programs. Mother denied having mental health issues and maintained her childhood trauma had not impacted her adult life, although she was "slightly depressed" being away from the children. She tried methamphetamine a few times but mostly smoked marijuana until she quit when the family maintenance case

4.

began in April 2019. Mother did not accept Li.P.'s disclosures of sexual abuse. Mother believed Li.P. was "confused," and she used her own history of childhood sexual abuse to further refute Li.P.'s disclosures.

Father stated during his social study he began living with mother and her family when he moved to California in November 2018, but they ended their relationship three or four months ago. He and mother, however, continued to share money and spend time together, and he wanted to be in a relationship with her. At the end of the Kansas case, he was not allowed back in the home due to failed urine tests.

L.P., who was in kindergarten, struggled with his behavior at school—he displayed bullying behavior in the classroom and on the playground and exhibited sexualized behavior by pulling his pants down. He was found eligible for mental health services. Li.P., who was in transitional kindergarten, also struggled with her behavior— she reportedly hit other children and had difficulty following directions. She was already receiving mental health services and was set to resume services through Parents United. She exhibited sexualized behaviors in her foster home and became violent in the home and with the care provider, who gave a 14-day notice. As a result, the girls were moved together to a new foster home. M.P. did not need mental health services and was being potty trained, but she also exhibited sexualized behavior in the foster home by taking off her diaper and using her fingers to play with her private area.

The parents were having supervised visits with the children. It was noted their parenting skills needed improvement, as they struggled to redirect the children when they misbehaved, and mother used guilt to try to control the children's behaviors. Li.P. exhibited sexualized and aggressive behaviors following visits, and told staff when she saw her parents, she wanted to kill herself, and she hated herself. It was recommended visits with father be suspended until Li.P.'s mental health could be stabilized through individual counseling and at Parents United.

Mother completed the parenting program she began during the voluntary case, but she had an intake appointment scheduled for another program at Sierra Vista Child Family Services (Sierra Vista), as she believed she could benefit from additional parenting services. Mother was receiving services at Parents United and had transitioned from a newcomer's group to an "Adults Molested as Children" (AMAC) group. Father was attending Parents United but continued to deny the abuse allegations. He had not yet completed the intake appointment to begin therapeutic visits with Li.P., which were previously ordered.

Mother's proposed case plan included attending mental health treatment and obtaining a medication evaluation; successfully completing a program such as Parents United to process her childhood trauma related to sexual abuse, acknowledge and accept Li.P.'s disclosures, and learn how to protect the children from further abuse; completing individual counseling; completing a parenting program at Sierra Vista; and random substance abuse testing.

The matter was set for a contested jurisdiction/disposition hearing, which was continued several times and ultimately held on January 15, 2020, when the parties reached a stipulated resolution. The juvenile court found the petition true, removed the children from parental custody, and ordered reunification services for both parents, approving mother's proposed case plan. Additional case notes submitted prior to the hearing stated a December visit between the siblings was "chaotic and out of control." Li.P. instigated matters by repeatedly touching her brother's bottom and refusing to listen to the visitation supervisor. The supervisor had to call coworkers to manage the situation, as Li.P. was defiant, running around, yelling, and showing poor physical boundaries which encouraged her siblings to follow suit. The juvenile court ordered Li.P. to undergo "more intensive therapy."

### *The Six-Month Review Hearing*

The Agency recommended continuation of the parent's services in its report for the six-month review hearing. The children were in individual placements separate from each other. L.P. completed kindergarten and was doing better although he still displayed some bullying behaviors. He was attending bi-weekly mental health counseling sessions. Li.P. completed transitional kindergarten and her behavioral incidents were subsiding. She was attending bi-weekly counseling sessions, but her Parents United group was cancelled on March 23, 2020, due to Covid-19. Li.P. was doing well in her new placement; she was no longer having tantrums, anger problems, or screaming. M.P. was showing behavioral challenges that included daily tantrums and she regressed in her potty training. She was scheduled for a new mental health assessment. An October 18, 2019 visitation note stated M.P. threw several tantrums, yelled, and was aggressive at a visit; the parents appeared hesitant to discipline her and did not give her any consequences when she misbehaved. L.P. asked visitation staff to impose a time out.

Mother's services were all in progress. She had been diagnosed with moderate major depressive disorder and was taking medication. In individual counseling, mother was working on codependency and identifying father as the perpetrator of Li.P.'s sexual abuse; she had not moved on to processing Li.P.'s experience as mother was still processing her own. In Parents United, mother gained insight into why she was resistant to believing Li.P.—she realized she had her own "daddy issues," as her relationships with her stepfather and biological father were not healthy, she believed a child should always have a father, and she was confused that Li.P. was loving to father, as she believed a sexual abuse victim had to hate her offender or express anger toward him. Parent/child labs had not taken place due to Covid-19, but mother had attended two out of 10 parenting sessions; she was attentive and able to demonstrate knowledge by completing homework assignments and role play.

Father and mother had contemplated moving in together, but he ended up living with mother's grandparents. Therapeutic visits between father and Li.P. were suspended due to Covid-19. Mother consistently visited the children. Due to the Covid-19 pandemic, in-person visits were suspended; instead, visits were conducted by video chat.

On July 7, 2020, the juvenile court followed the Agency's recommendation and continued services to the 12-month review hearing, which the court set for October 9, 2020.

***The 12-Month Review Hearing***

The Agency's 12-month review report recommended services continue for both parents and the juvenile court grant the Agency discretion to begin a trial visit at mother's home. L.P. was attending his first-grade class via distance learning and was still in mental health counseling. Li.P. was continuing with bi-monthly mental health counseling; her Parents United groups resumed as of August 17, 2020. M.P. was assessed twice for mental health services but was found ineligible each time.

L.P. and M.P. were doing well in their homes, but Li.P. continued to have behavioral issues. She threw tantrums, tormented the other foster child, and ran from the care provider, who gave a 14-day notice. Li.P. changed placements again in September 2020.

Mother indicated in Parents United counseling that she now believed Li.P. and she felt guilty about not accepting her disclosure. Mother reportedly was doing "amazing work" and making positive progress. Mother's Sierra Vista counselor noted mother now understood she should have believed Li.P. from the start and was working on the "self-hate and guilt" for not believing her. Mother was assigned a new counselor, Judi Schardijn, in August 2020. She consistently tested negative on random drug tests. Mother was working 65 hours a week as an IHSS provider.

Mother continued to consistently visit the children. Due to the pandemic, she was restricted to video chat visits from June 12 through September 4, 2020, except for two in-

person visits—one in July and once in August. During the July in-person visit, the supervisor noted the children often disregarded mother's redirection from inappropriate behavior, and she appeared overwhelmed at times. At the August in-person visit, the supervisor noted mother engaged with the children, talked to them frequently, and had appropriate conversations. The children had to be transported separately to visits because they were physically forceful with each other. Mother was told in August 2020 that, due to the pandemic protocols, community visits could not be monitored; therefore, visits had to remain at the Agency until she could begin a trial visit.

In assessing the current situation, the social worker noted that while both mother and father had been cooperative and engaged in services, and they consistently visited the children, "visiting is not parenting." Neither parent had made themselves available for the child family team meetings to discuss the children's needs or taken responsibility for why the children came to the Agency's attention.

At the October 9, 2020 12-month review hearing, the juvenile court adopted the Agency's recommendations—it continued services for both parents and granted the Agency discretion to begin a trial visit with mother only, which the social worker could terminate if necessary. The juvenile court set an 18-month review hearing for February 5, 2021.[2] Mother's updated case plan added requirements to complete at least three parent/child labs and work weekly with a parent mentor who would help her develop appropriate parent-child relationships, boundaries and rules, and implement positive consequences.

### The February 2021 18-Month Review Hearing

In its report for the 18-month review hearing, the Agency recommended termination of father's services, continuation of mother's services, and a 90-day continuance of the hearing in order to assess mother during the trial visit with M.P.,

---

[2] Further references to dates are to the year 2021, unless otherwise stated.

which began on December 18, 2020, and allow the older children, who remained in separate foster homes, to begin trial visits with mother.

L.P. continued to receive mental health counseling and was on psychotropic medication, which was being adjusted. He did not do well with other children in the foster home, as he behaved aggressively toward them. The foster parents, however, were committed to keeping him and chose to have the other children removed.

Li.P. continued in individual counseling and Parents United, where they were working on her aggression and lack of boundaries. Li.P. had bonded with her current care providers, but she continued having problems getting along with other children in the home and had episodes of tantrums and aggression.

M.P. began preschool prior to starting her trial visit. Her behaviors there, which included tantrums, fighting, being disruptive, and hitting other children and the teacher, resulted in a two-week suspension from preschool. M.P. was assessed for mental health services on December 28, 2020, and was found eligible on January 6. She was referred to Leaps and Bounds and began a "Tots Group" with Parents United on January 4. Mother was overwhelmed at the beginning of the trial visit with the transition and M.P.'s high needs, but the social worker believed she was committed to M.P.'s needs. She missed the first two visits with the two older children after M.P. was placed with her.

Mother continued to attend the AMAC group at Parents United, but the counselor noted on October 27, 2020, she appeared to be "zoned out" and wondered if she might be under the influence of something or very depressed. Her counselor was working with her on, among other things, taking responsibility and being proactive. On January 12, it was reported mother was making good progress in her AMAC group, but she was tired due to M.P.'s trial visit.

In counseling, Mother continued to take responsibility for Li.P.'s molestation. She did not have concerns about her interactions with the children or their behaviors; instead, she believed "foster care" was the problem. Father, however, admitted in counseling the

children's challenging behaviors existed prior to being in foster care. Mother's counselor, Schardijn, retired, so she was transferred to a new counselor, Larinda Carrier, on December 29, 2020. With respect to parenting, she had six individual parenting sessions and three parent/child labs to complete, which were delayed due to Covid-19, and she was recommended for more individual counseling sessions. Mother was working with a parent mentor weekly. Mother reportedly was working as an IHSS provider 40 hours a week.

The social worker opined there continued to be detriment to the children if they were returned to mother or father. There was no likelihood father could reunify with the children, as he had not made substantive progress in his services—he continued to test positive for substances, had sporadic and inconsistent engagement with services providers, and refused services. Mother, however, had made progress in her services; she stayed engaged and was consistent with visitation and attending services. The family continued to partially visit via Zoom into November 2020. When mother was provided in-person visits, it was noted her parenting skills were appropriate. L.P. and M.P. were transported together to a visit in December 2020.

The social worker stated that while mother struggled with M.P. and was overwhelmed at the beginning of the trial visit, she was committed to M.P.'s needs and would be starting a trial visit with the older children soon. The social worker was slowly transitioning the children to mother due to their behaviors and high needs and believed reunification could be achieved if mother continued to make good progress and demonstrate she could safely parent the children and be protective of them.

At the outset of the 18-month review hearing on February 5, the juvenile court stated it made two attempts to reach mother by telephone, but both went to voicemail and she did not appear at the hearing. County counsel explained a continuance was needed so mother could learn how to successfully parent all three children at the same time and the Agency could see how she did with the children in her home to assess whether there

11.

would be substantial risk of detriment if they were officially returned to her custody in 90 days. While the children's attorney agreed with the 90-day continuance, she opposed the Agency's plan to place the older children with mother on a trial visit due to concerns about mother's ability to handle M.P., the children's challenging behaviors, and father's continued contact with the children. The children's attorney asked the juvenile court to set a hearing in 30 days to see how M.P.'s trial visit was going and reassess at that time.

The juvenile court found it would be detrimental to return the children to either parent, the parents had been offered and provided reasonable services, there was not a substantial probability the children would be returned to father's custody but there was a substantial probability they would be returned to mother's custody, and mother made significant progress in resolving the problems that led to removal. The juvenile court terminated father's reunification services but continued mother's services. The juvenile court stated it would set a review in 30 days, as it shared serious concerns about mother's ability to protect the children from father and her capacity to parent all three children. The juvenile court authorized M.P.'s continued trial visit and directed the Agency to "closely monitor" the situation; declined to authorize discretion for a trial visit with the older children; and set a 30-day review hearing for March 5 and a continued review hearing for May 3, finding extraordinary circumstances to continue services due to the pandemic and the children's serious behavioral issues.

***The Agency's Section 388 Petition***

On February 23, the Agency filed a section 388 petition seeking, among other things, modification of the order continuing mother's reunification services to an order terminating her services. As changed circumstances, the Agency alleged it terminated mother's trial visit with M.P. on February 17 due to safety concerns raised by various service providers and because mother had not engaged with services at Sierra Vista since December 2020. The Agency asserted it would be in the children's best interest to terminate mother's services so they could have permanency, as they had been in

12.

placement since August 2019, L.P. had been with his current care providers, who were committed to adopting him, since November 7, 2019, and M.P. was placed in a concurrent placement on February 17.

The Agency filed a report in support of the petition in which it recommended the juvenile court terminate mother's services and set a section 366.26 hearing. While L.P. and M.P. were in concurrent placements, Li.P. was in a foster home that was not a concurrent home.

Contact logs submitted with the report detailed events that occurred after M.P.'s trial visit began on December 18, 2020. Initially, mother missed two visits with the older children, but community visits then began with Li.P. Mother reported on December 21, 2020, that M.P. had gotten a few scratches from mother's cats but M.P. would not stop picking them up. The social worker recommended she redirect M.P. and teach her good/bad touches with the cats.

On December 28, 2020, mother informed the social worker M.P. had a mental health assessment that day and she was told from the information she provided it looked like M.P. would not need counseling. At a January 5 meeting for L.P., mother shared she was having problems with M.P. and had been struggling with redirecting her, explaining that M.P. had a "really big episode" the day before and she had not heard from the parent mentor. Later that day, the social worker told mother she submitted another referral for a mental health assessment for M.P. and explained mental health is inclusive of behavioral health; therefore, if mental health is a concern mother, should answer "yes."

A child family team meeting was held on January 15. Mother reported M.P. was getting better with the cats. M.P. was found eligible for mental health services and a child family team meeting would be set to decide which "path" M.P. would be eligible for, and M.P. began services at Parents United. Mother started working with the parent mentor and would meet with her weekly.

A home visit was conducted on January 22. The social worker observed M.P. constantly required mother's attention and she was not redirected with the television or tablet. Mother did not use a stern voice with her; it appeared mother needed additional assistance to learn to be an authority figure. M.P. picked up the cats roughly, scooping them up like they were dolls, and carrying them under one arm. Mother said she attempted to attend her last appointment with Schardijn, but Schardijn was not there. The social worker said she would set up mother's parent/child labs, but mother was responsible for engaging with her service providers and advised her to follow up with her appointments.

At mother's January 25 visit with the children, M.P. had a meltdown; she hit mother and screamed at her and then bit mother's arm. M.P. created chaos at the visitation center by throwing chairs and overturning a table, disrupting the entire department for 40 minutes. Mother had few, if any, skills for managing her. The parent mentor removed M.P. once, but she continued to scream and run around. Finally, the older children were able to comfort M.P. and she calmed down.

The next day, the parent mentor reported to the social worker that at her first meeting with mother and M.P. a few weeks earlier, M.P. was screaming so much the parent mentor eventually had to leave because mother was not able to calm her down. At one point, M.P. fled from mother's care while at a bus stop. The parent mentor told mother she needed to contain M.P. and while mother would talk to M.P., she did not follow through on consequences. M.P. had a Parents United session and visits with mother and her siblings back-to-back on Monday afternoons, which the parent mentor believed was too much for M.P. to handle and contributed to her behavior at visits.

Mother spoke with the Leaps and Bounds provider on February 2 and scheduled the first session for the following week. The provider later told the social worker the parent mentor and social worker provided her with M.P.'s behavioral challenges, while mother reported differently. Based on what mother reported, the provider was going to

14.

work with M.P. and mother twice a month via phone, but once she spoke to the parent mentor and social worker, she submitted a referral for a higher level of care.

On February 5, a social worker made an unannounced visit to mother's home after the 18-month review hearing. Asked if she had a court hearing that morning, mother stated they called her twice, but she missed the calls because it was too early in the morning. The social worker noticed M.P. was gentler with the cats and there were "big improvements" in her behavior. The parent mentor also visited mother in her home that day. Mother told the parent mentor M.P. was worse with the cats that morning, so she was not permitting her to hold or play with them. The parent mentor asked if mother had implemented anything they talked about the prior week, but mother did not remember what they talked about. When reminded, she appeared to remember, but she had not relayed the information about how to avoid and respond to tantrums to maternal aunt, who babysat M.P. Mother did say she was able to get M.P. into her car seat willingly.

The social worker held a monthly compliance meeting with mother on February 8, which the parent mentor attended. Mother stated her new Sierra Vista counselor, Carrier, had not called her and she confirmed her last appointment was with Schardijn in December 2020. The social worker reminded mother it was her responsibility to follow up and schedule appointments. The social worker shared the conversation she had with the Leaps and Bounds provider concerning the February 2 assessment and reminded mother that minimizing the children's behaviors could cause them to go without services.

The social worker was concerned mother's cats would attack M.P. because she was picking them up roughly. Although mother said M.P. was "getting better" with the cats, the social worker had observed mother failing to redirect M.P. when she picked them up or telling her how to pick them up. In discussing M.P.'s trial visit, mother stated M.P. was "much better," had "made progress," and the visit had been "great."

Mother's parent mentor asked mother to share with the social worker the two things she advised mother to work on with M.P., but mother could not remember what

15.

they were and had to be reminded. The social worker reviewed the parent mentor's concern that M.P. had too many sessions scheduled on one day. Mother could not remember what the parent mentor advised her to do when M.P. was having a tantrum and time outs did not work, but when the parent mentor reminded her to be aware of why M.P. was having the tantrum and give her options, mother responded she had been doing that and she did not "know what you want me to do."

The social worker had a conversation with the parent mentor after the meeting. Among other things, the parent mentor observed mother had no follow through and she believed mother was working 60 hours a week, which left her to wonder when mother was seeing M.P. Mother was gone for long periods of time, leaving M.P., who continued to have tantrums, with maternal aunt. While the mentor encouraged mother to spread out M.P.'s appointments, mother insisted on keeping them all on Mondays due to work.

A child and family team meeting regarding Leaps and Bounds services for M.P. was held on February 12 via Teams. Mother did not answer the first phone call, but she answered when she was called from a different phone; mother thought the meeting was in July, although she had been informed of this meeting date. Mother expressed only minimal concerns with M.P.'s behavior, stating she shares well and there was no fighting or yelling during Zoom visits. The social worker and parent mentor intervened to discuss behavioral issues they either observed or been advised of, including mother struggling to redirect M.P., who was still very rough with the cats.

On February 17, the social workers went to mother's home to terminate M.P.'s trial visit due to safety concerns, which the social workers reviewed with mother. Carrier had made an appointment with mother for February 16, but mother did not attend the session or contact Carrier to provide a reason for missing it. When the social worker told mother about the missed appointment, mother responded, "[W]hat appointment"? The social worker stated mother had not been compliant with counseling services since she last saw Schardijn in December 2020; mother replied, "Judi was a piece of crap" and she

had not "seen Larinda's face" or talked to her. The social worker again reminded mother she ultimately was responsible for engaging with the service providers. Mother became defensive, stating "this is bull shit."

Other concerns the social worker reviewed were mother twice jeopardizing M.P. from receiving mental health services by minimizing her behaviors; mother's unwillingness to be flexible when the social worker and mental health providers attempted to set up a child family team meeting to get M.P.'s services started; M.P.'s continued interactions with the cats, which included "squeezing them around their throat[s]," "pulling their skin," and "picking them up by their paws"; and the January 25 visit where M.P. bit mother's arm, as well as a February 8 visit where mother was carrying M.P. down the hallway with M.P. kicking and screaming. In addition, the social worker continued to receive reports about safety concerns from service providers when they were trying to work with mother.

M.P. was placed in a concurrent foster home. The following day, her care providers reported she had bruising on her thigh and bottom and an abscess on her foot. Mother had not reported any bruises as required under the trial visit rules. On February 19, the social worker received a report from one of M.P.'s mental health counselors that mother told her one of the "interventions" she used when M.P. was acting out was to put her in the closet and turn the light off, although "one of us" was in there with her. Asked how effective this was, mother stated M.P. did not like it. Based on this information, a suspected child abuse referral was made, and an investigation begun. When M.P. was interviewed on February 22, she said she was put in "mommy's closet" and showed her bruises but not how she got them.

The social worker spoke with M.P.'s counselor to obtain more information about her report of the use of the closet. The counselor explained when she asked mother the current interventions she used to decrease M.P.'s aggression, mother casually answered she put M.P. in the closet with the lights off, and M.P. "doesn't like it" and "it's not

17.

working."  When mother observed the counselor appeared concerned, she added, "one of us is always in there with her."  The counselor believed this was mother's "go to" for attempting to decrease M.P.'s aggression.

Mother, when interviewed, explained M.P. "plays really hard"; she bruised her forehead when she hit the coffee table while trying to get the cats and dove on the wood panel flooring trying to catch them.  Mother did not always see the bruises and was not always with M.P., as maternal aunt cared for M.P. when mother was not there.  Mother admitted noticing the bruises and she "messed up" by not reporting them, but she denied causing them.  Mother explained she would sit with M.P. in the closet with the lights off until M.P. calmed down.  They then would talk about what M.P. did, and M.P. would apologize and say she was sorry.  She said it only lasted three to four minutes, and the last time she used the closet was the prior Wednesday, which was the day M.P. was removed.  Mother found the closet to be the most effective form of discipline and when M.P. got scared they would talk it out and she would tell her "it is not scary."  Mother understood putting M.P. in the closet was "unusual" but M.P. would apologize when she misbehaved.  Mother did not use this form of discipline with the other children as they were "pretty mature" and listened most of the time.

### The Hearing on the Section 388 Petition

The juvenile court set an evidentiary hearing on the section 388 petition; a contested hearing was held on April 30.  The social worker testified about mother's failure to report any behavioral concerns to the provider during the December 2020 assessment and how M.P. was found eligible for a higher level of services only after the Leaps and Bounds provider spoke to the social worker and parent mentor as mother had not given the provider much information.  M.P. was seeing a support counselor twice a week and a mental health clinician once a week.

At a child family team meeting held two days before the hearing, mother shared she was unaware of some of M.P.'s issues, such as grabbing food and overeating, and she

believed her visits went well with no concerns about M.P.'s behavior. At a visit that week, however, the visitation center reported mother's parenting skills needed improvement, as she was unable to control the children when they were roughhousing and running around.

The social worker summarized the problems resulting in the termination of the trial visit: mother's failure to engage in services at Sierra Vista after her prior counselor retired; her minimization of M.P.'s mental health issues; M.P.'s safety with the cats in the home; and the reports from service providers and the parent mentor. All the observation logs documented concerns, but the most worrisome incident was the January visit where M.P. was out of control. Both the social worker and parent mentor were concerned about mother's inability to contain M.P.

After the trial visit ended, the social worker learned about mother's use of the closet as a method of discipline, which was not an appropriate way to discipline a three-year-old, and the bruises on M.P.'s bottom and legs. The bruises were a concern because the children had bruises when they were initially removed, which indicated a pattern. Since mother's trial visit with M.P. was unsuccessful, she was unable to attempt a trial visit with the other children; mother had run out of time and the Agency continued to receive ongoing reports from different providers with the same concerns.

The social worker testified L.P. continued to have boundary challenges with inappropriate and appropriate touching and he did not get along with other children. Li.P. was in her sixth home because of her physical aggression and anger. She choked a nine-year-old child in her last home. Li.P. told the social worker she was angry because of what father did to her and she appeared to have self-hate, which were being addressed with her in services. Li.P. was not in a concurrent home; she was in a home where there were no other children. M.P. was placed in a concurrent home when the trial visit ended on February 17.

Mother had not completed any case plan component. Mother had not graduated from her Parents United program; while the last report the social worker received that week stated mother continued to engage, the social worker did not know mother's progress. Mother failed to implement what she was being taught, as demonstrated by her failure to instruct M.P. on how to treat the cats despite a social worker and parent mentor discussing the issue with her.

Mother testified her children were removed because she "broke a family plan" and failed to protect them. Mother denied she refused Sierra Vista's services when she failed to attend them for about two months; rather, she "had a lot going on," and "a lot of appointments," although she admitted that was no excuse. Mother was aware she was ordered to participate in services during that time.

Asked why she did not intervene when M.P. was abusing the cats in front of the parent mentor, mother responded she was "not very good" when other people were in the room. Mother said she did not have a long time to work with M.P. regarding the cats; mother claimed M.P. was getting better with them and she and maternal aunt were showing her how to treat them. When asked why she did not follow up with the provider who assessed M.P. in December 2020, mother responded M.P. was not having any behavioral issues at the time.

Regarding visits, mother stated when M.P. was placed with her "she had a few incidents where she had bit me on the arm, and it was—it was really hard to control her in the room, so I think a few of those visits were pretty rough with M[.P.] and L[i.P.] too. They like to bicker with each other. But other than that, I mean, I thought that my visits were going pretty well." When asked about reports she was having difficulty managing and engaging with the children during visits, mother responded: "I don't feel like that's a concern for me. I engage with all three of them pretty well." Mother, however, admitted it was "difficult at times" to manage their behaviors. Mother agreed her parenting could

20.

improve, but the children had been out of her home for so long it was hard when they only had an hour or two to visit.

Mother did not mean to miss the first two visits with the older children when M.P. was first placed with her, but M.P. was "a very energetic little girl" and "the center of attention." It was difficult for her to manage M.P. when visiting the older children. Mother admitted it would be a challenge to manage all three children if they were returned to her, but she had learned skills to help her manage their behaviors.

Through her Parents United services, mother had been able to accept that father sexually abused her daughter. Mother admitted the parent mentor and a social worker gave her techniques to teach M.P. how to interact with the cats, but she did not start using them right away because M.P. "didn't ever stop touching the kitties so I kind of spaced out, and I forgot about the technique." She started using the techniques when it started "getting like pretty serious."

When M.P. acted out, mother said either she or maternal aunt took M.P. into mother's walk-in closet and they sat in there with the light off. A few times M.P. mentioned the dark was scary and there were monsters, but they would tell her "the dark wasn't a scary place," "[m]onsters aren't real," and they were right there and would turn on the light as soon as she calmed down. Mother said they were in there only about three or four minutes, and M.P. was never alone. They went into the closet three or four times a day, but not every day. She started using this method about a month after M.P. was placed with her. She got the idea from Li.P.'s previous counselor, who put Li.P. in an empty room with the lights on until she calmed down.

Regarding M.P.'s bruises, mother testified she "messed up" because she did not take pictures of "every clumsy bruise she got by diving for the cats." M.P. also had a lot of toys all over her bedroom floor; she was "very clumsy" and would fall on her toys. Mother denied giving M.P. the bruises.

Mother testified about her understanding of each's child's behavioral issues. If the children were returned to her, she could be "as calm as possible," put the older children in time-outs, and do a lot of redirecting and eye-to-eye contact with the girls. The juvenile court asked mother "[h]ow difficult do you think it would be, honestly, to have all three kids?" Mother replied: "It is probably going to be pretty difficult, yeah," and "[i]t would be a challenge." Mother, however, thought she could handle it.

Asked about the children's behavior before removal, mother stated the two older children did a lot of "roughhousing a little bit like but in a playful way," and "[t]hey were very energetic." She said they argued and were not able to share toys, but she believed their behaviors had "gotten extremely worse since then." If the children were returned to her, she would continue the children's services and maternal aunt would watch them when she went to work. Mother agreed she was still having challenges trying to follow through on discipline and consequences during visits, stating "[s]ometimes it is hard to follow through."

In closing arguments, county counsel argued the termination of mother's trial visit constituted changed circumstances warranting the termination of her services, she failed to make the progress necessary to ensure the safe return of the children, and it was in the children's best interests to terminate services so they could be provided permanency. County counsel noted this is an "outer-limits" case as the 18-month date was February 15 and the continuance was to assess the trial visit, which had ended. The children's counsel asked the juvenile court to follow the Agency's recommendation.

Mother's attorney argued the concerns at the outset of the case regarding mother's inability to accept the sexual abuse and her substance abuse were no longer issues, and now the problem in the Agency's eyes was her parenting style. Mother's attorney urged the juvenile court to apply the standard for an 18-month review hearing—the court must return custody of the children to mother unless it finds a substantial risk of detriment by a preponderance of the evidence—and argued there was insufficient evidence to keep the

children out of mother's care. The attorney asked the juvenile court to deny the section 388 petition and either return the children to mother with family maintenance services or extend her services beyond the 18-month mark on a finding of extraordinary circumstances.

In ruling, the juvenile court believed mother's testimony was credible and she loved her children, but she had over 20 months of services and even if it found extraordinary circumstances to continue to the 24-month juncture, she would not be in a position to take care of the children within the next three and a half months. The juvenile court found, based on a preponderance of the evidence, there would be a substantial risk of detriment if the children were returned, although it recognized that was not at issue since this was not an 18-month review hearing. The juvenile court stated even if it had the authority to order return of the children that day, it did not see how it would be beneficial for them to be returned to mother given their extreme behaviors and inability to get along with each other.

The juvenile court found there was a significant change in circumstances in that the trial visit did not work and there was no evidence mother was able to properly care for all three children, noting even one-hour visits were problematic as mother was unable to redirect the children appropriately and safely. The juvenile court further found granting the section 388 petition would be in the children's best interests. The juvenile court terminated mother's reunification services, found that reasonable services were offered or provided to mother, and set a section 366.26 hearing for August 26, 2021.

## DISCUSSION

There is a statutory presumption at each review hearing that the child will be returned to parental custody. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308.) That is unless the juvenile court finds by a preponderance of the evidence that doing so would "create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a)(1).) If the court finds it would be

23.

detrimental to return the child, it has the option of continuing reunification services up to the 18-month review hearing. At that point, the court must either return the child to parental custody or set a hearing under section 366.26 to select a permanent plan. (*Id.*, subd. (a)(3).)

There is statutory authority to extend reunification services to 24 months when a parent is: a resident of a court-ordered substance abuse treatment program; recently discharged from incarceration, institutionalization, or the custody of the United States Department of Homeland Security; or a minor or nonminor dependent at the time of the initial hearing. (§ 366.22, subd. (b).) The court must also find the parent is making significant and consistent progress, there is a substantial probability the child will be returned to parental custody, and it is in the child's best interest to continue reunification efforts. (*Ibid.*) None of these situations, however, apply here.

There are court-created exceptions, however, that allow a juvenile court to continue reunification services beyond the 18-month review hearing: (1) when the court finds the parent was never provided reasonable reunification services (*In re M.F.* (2019) 32 Cal.App.5th 1, 21); or (2) in a special needs case where there are extraordinary circumstances that prevented the parent from participating in the case plan (*Andrea L. v. Superior Court* (1998) 64 Cal.App.4th 1377, 1388; *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1777).

Here, the juvenile court relied on the latter exception to extend mother's services to May 3, finding extraordinary circumstances existed, namely, the pandemic and the children's behaviors. A little over two weeks later, the Agency brought the section 388 petition to terminate to mother's services, asserting termination of the trial visit constituted changed circumstances and it would be in the children's best interest to provide them permanency.

Any party may petition the court to modify or set aside a prior order on the grounds of change of circumstances or new evidence. (§ 388, subd. (a).) As the

24.

petitioner, the Agency had "the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child." (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.)  Whether the juvenile court should modify a previously made order rests within its discretion, and its determination may not be disturbed unless there has been a clear abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)  The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. (*Id.* at pp. 318–319.)  All conflicts in the record must be resolved in favor of the juvenile court's decision and all legitimate inferences indulged in to uphold that decision. (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214.)  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court. (*In re Stephanie M.*, at p. 319.)

The juvenile court here found everything needed to grant the section 388 petition and terminate mother's reunification services.  Specifically, the juvenile court found a significant change of circumstances, namely, that the trial visit did not work, there was no evidence mother was able to properly care for all three children, and it was in the children's best interest to terminate mother's services.

Mother appears to contend the juvenile court was required to return the children to her because its detriment finding at the February 5 hearing was inconsistent with its order granting mother a trial visit with M.P.  As real party in interest points out, this finding was not appealed; therefore, it is final and may not be attacked in this writ proceeding. (*Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 811–812.)  Moreover, the case mother relies on, *Savannah B. v. Superior Court* (2000) 81 Cal.App.4th 158, is inapplicable here.  There, the appellate court held the juvenile court's dispositional orders removing the minor from the parent's custody but simultaneously placing the minor back with the parent for a 60-day visit were a "legal fiction" and inconsistent. (*Id.* at pp. 160–162.)  In contrast here, we are not dealing with disposition, but a situation where the

25.

children had been removed from mother's custody for over 12 months when the juvenile court modified the visitation order to allow for an extended visit at the social worker's discretion. This was a permissible delegation of power over visitation to the social worker. (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1374.)

Mother does not contend the Agency failed to establish changed circumstances or best interest. Instead, she argues the juvenile court was required to conduct the April 30 hearing in a manner consistent with section 366.22 and make a detriment finding. She further argues there was insufficient evidence of detriment because termination of the trial visit was unwarranted, she did not pose a safety threat to the children, and she made substantial progress with her services.

Mother, however, does not cite any authority for the proposition that the juvenile court was required to make a detriment finding when ruling on the section 388 petition. Moreover, mother ignores the juvenile court essentially made such a finding when it stated if it were conducting an 18-month review hearing, it would find there would be a substantial risk of detriment if the children were returned to mother that day. Finally, we note that in ruling on the section 388 petition, the juvenile court made a finding equivalent to detriment when it found mother had over 20 months of services, there was no evidence she was able to properly care for the children, and even if it extended mother's services to the drop-dead date of 24 months, she still would not be in a position to take care of all the children. (See, e.g., *In re J.P.* (2014) 229 Cal.App.4th 108, 126 ["[a] finding that … there is a substantial likelihood reunification will not occur because of the action or inaction of the parent, is equivalent to a finding of detriment"].)

Even if a detriment finding were required, substantial evidence supports it.[3] Although mother had made progress in accepting Li.P. was sexually abused, the children

---

[3]    We review the juvenile court's findings and orders for substantial evidence. (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1378–1379.) In so doing, "we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] 'We do not

all had behavioral problems that were beyond mother's ability to handle despite receiving 20 months of services.  Mother did not recognize the severity of the children's problems and did not take their emotional and behavioral issues seriously, which led to her failing to prioritize their needs for treatment, and she dismissed her own failures as insignificant. Mother had a habit of acknowledging she "messed up" and apologizing, but then would turn around and repeat either the same or similar behavior.  After 20 months of services from multiple providers, mother failed to learn skills to control even one of her children. Despite the parent mentor's hands-on coaching, mother admittedly did not put the techniques she was being taught into practice "right away," although she did so "eventually" once she remembered the techniques and things got "pretty serious."

Mother's inability to handle the children created a substantial risk of detriment to them if they were returned to her.  This was demonstrated by mother's inability to control M.P.'s behavior with respect to the cats, which mother admitted led to M.P. sustaining bruises, as well as with M.P. running away from mother at the bus stop.  Given mother's lack of insight into the children's problems and her ability to control them, the children were at risk of harming themselves or each other should they be returned to her.

Mother asserts the reasons the Agency terminated mother's trial visit did not create a safety risk for the children.  She claims her minimization of the children's behaviors was not a problem because M.P.'s provider at Leaps and Bounds was aware of her tendency and M.P.'s services had been adjusted.  Mother's minimization, however, was not a one-time occurrence; rather it was an ongoing problem—she repeatedly minimized their behaviors to the point where she believed visits with them were going well.  While mother asserts the cats were no longer a problem because she addressed the issue, M.P.'s bruises, which mother said were caused by M.P. diving after the cats, show

---

reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' " (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.)

27.

the problem persisted. The other concerns involved mother's failure to alter her behavior and her continued lackadaisical approach to services, both of which placed the children at risk because she was not applying the skills necessary to control the children, which placed them at risk.

Mother asserts the juvenile court failed to consider the progress she and the children made and instead focused on their struggles. While the children had made progress, the older children still could not get along with other children and M.P. continued to have tantrums and exhibit out-of-control behavior. It is true mother was processing her own molest issues and believed Li.P.'s disclosure, but she did not fully acknowledge the children still exhibited sexualized behavior and did not demonstrate in services or visitation she was able to deal with the children when they were acting out.

Mother asserts there were less drastic means to address the deficiencies the Agency cited, namely, returning the children to her custody and ordering family maintenance services under court supervision, citing *In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1403. This ignores, however, the substantial evidence of detriment as demonstrated by mother's inability or unwillingness to use the skills she learned through her programs and the parent mentor in attempting to control M.P.'s behavior. While, as mother points out, she is not required to complete the entire reunification plan in order to have the children returned, detriment existed as it was clear mother was not going to change in the very near future and was not capable of safely parenting one child, much less three difficult children with differing needs.

Finally, mother contends if there is substantial evidence of detriment, the juvenile court should have denied the section 388 petition and extended her services to 24 months. She asserts under section 352, subdivision (a), there was good cause to continue the hearing because the children were bonded to her and each other, only L.P. and M.P were in concurrent homes, and the Covid-19 pandemic created a difficult situation that negatively impacted the quality of the family's visits and services. Mother argues the

28.

juvenile court, rather than recognizing the family's unique circumstances and the extenuating circumstances the pandemic posed, abused its discretion when it terminated her reunification services.

As real party in interest points out, mother did not miss any of the extended services that were ordered at the 18-month review hearing on February 5, as she continued to receive services between the filing of the section 388 petition and the April 30 hearing, which occurred only three days before the May 3 continued review hearing date. At the April 30 hearing, the juvenile court conceded it could find extenuating circumstances to continue the hearing until the 24-month "drop-dead date" of August 15, but it did not believe mother would be able to take the children at that time.

That finding, which mother does not address, was supported by substantial evidence. Mother failed to learn and make changes in her parenting after receiving approximately a year of services in Kansas, three months of family maintenance services before the dependency petition was filed in this case, and 20 months of family reunification services. Mother simply does not have the will or ability to develop necessary skills to safely parent her children and even after exceeding the statutory allotment of services, she still could not recognize, much less correct, the deficiencies in her parenting to become even a minimally sufficient parent.

In sum, the juvenile court did not abuse its discretion in granting the Agency's section 388 petition, terminating mother's services, and setting a section 366.26 hearing.

## DISPOSITION

The petition for extraordinary writ is denied. This court's opinion is final forthwith as this court pursuant to California Rules of Court, rule 8.490(b)(2)(A).